# Exhibit 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF WESTCHESTER**

-------------------------------------------------------------------:

AVERY STONE,                                           :

             Plaintiff,                        :

                                             :                    **SUMMONS**

      -against-                                :

                                             :

SOUTH CHINA MORNING POST PUBLISHERS     :

LTD. and PETER GUY, in his professional and personal  :                    **Index No.**

capacities,                                            :

                                             :

             Defendants.               :

-------------------------------------------------------------------:

To the Defendants in this action:

**South China Morning Post Publishers Ltd.**        **Peter Guy**
**Morning Port Centre**                         **Morning Port Centre**
**22 Dai Fai Street**                            **22 Dai Fai Street**
**Tai Po Industrial Estates**                  **Tai Po Industrial Estates**
**Tai Po, New Territories, Hong Kong**       **Tai Po, New Territories, Hong Kong**

**You are hereby Summoned** and required to serve upon Plaintiff's attorneys an answer to the
Complaint in this action within twenty (20) days after service of this Summons, exclusive of the day of
service, or within thirty (30) days after service is complete if this Summons is not personally delivered
to you within the State of New York.  In case of your failure to answer, judgment will be taken against
you by default for the relief demanded in the Complaint. The basis of the venue designated is that the
residence of the Plaintiff is located within this district.

Dated: Orangeburg, New York            Respectfully submitted,
       September 21, 2017

                                 **KEVIN T. MULHEARN, P.C.**

                                 *Kevin T. Mulhearn*

                              By:_____

                                   Kevin T. Mulhearn

                               *Attorneys for Plaintiff, Avery Stone*

        *Of  Counsel:*   *Philip M. Culhane*        60 Dutch Hill Road, Suite 15

                                 Orangeburg, New York 10962

                                 Phone: (845) 222-8092

                                 Fax:   (845) 398-3836

                                 Email: kmulhearn@ktmlaw.net

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF WESTCHESTER**

------------------------------------------------------------------ :
AVERY STONE,                                                       :
           Plaintiff,                               :
                                       :     <u>**COMPLAINT**</u>
      -against-                                                 :
                                        :
SOUTH CHINA MORNING POST PUBLISHERS               :
LTD. and PETER GUY, in his personal and professional  :
capacities,                                                        :          Index No.
                                        :
           Defendants.                              :
------------------------------------------------------------------ :

### <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

      Plaintiff, Avery Stone (the "Plaintiff"), by and through his attorneys, Kevin T. Mulhearn, P.C., as

and for his Complaint in this action against Defendants, South China Morning Post Publishers Ltd.

"South China Morning Post"), and Peter Guy, in his professional and personal capacities, hereby alleges

the following:

### <u>NATURE OF THE CLAIMS</u>

1.   This action is for declaratory, injunctive and equitable relief, as well as for monetary
   damages, to redress acts of defamation and libel *per se* committed by Defendants against the
   Plaintiff.

2. Defendants' unlawful conduct was knowing, malicious, willful and wanton and/or showed a
   reckless disregard for the Plaintiff's rights, which has caused, and continues to cause, the
   Plaintiff disgrace, humiliation and shame throughout the world, permanent and irreparable
   harm to his professional and personal reputations, and severe mental anguish and emotional
   distress.

## PRELIMINARY STATEMENT

3.  This case is about acts of defamation and libel *per se* committed by South China Morning Post and Peter Guy, its reporter, against a man, Avery Stone, who was a director at a struggling, yet entirely legitimate and law-abiding Hong Kong business—Global Merchant Funding, Ltd. ("GMF").

4.  Specifically, in a news article published by South China Morning Post on September 22, 2016 (attached as Exhibit A), Defendants South China Morning Post and its reporter, Peter Guy, falsely, maliciously and with reckless disregard for the truth, stated as facts that: (1) Avery Stone, along with his GMF partners, "have absconded" with $58 Million Dollars invested into GMF;  (2) that the Hong Kong Police were investigating—but had not yet charged—Avery Stone and his partners for "misappropriation"; (3) that said monies "disappear[ed] without a trace;" (4) that GMF shareholders and forensic accountants had been unable to contact Avery Stone and his partner since early 2016; and that GMF's lending operations operated as a "Ponzi scheme."

5.  Moreover, after Bloomberg L.P published a defamatory article about Avery Stone on October 31, 2016, in an editorial published by South China Morning Post on November 1, 2016, Defendant South China Morning Post, falsely, maliciously and with reckless disregard for the truth, stated as facts that: (1) Avery Stone and his partners "***systematically preyed off [his] friends***" and intentionally "duped his friends" in an illegal Ponzi scheme to make money with no hope of actually realizing a positive return on their investments; (3) that in early 2016, "everything unraveled, and [Avery Stone] vanished;" (4) that Avery Stone and his partners "relieved some of Hong Kong's top bankers of US $32m, then disappeared; (5) the Hong Kong Police were investigating Avery Stone and his partners for misappropriation; and (6) quoting Richard Stone, Avery Stone's father, that Avery Stone was a "***crook***" and a

2

"*low-life*" who was "*lying low*" after stealing $400,000.00 of family possessions from his own father.

6. Moreover, in the South China Morning Post's November 1, 2016 publication, Defendant published a picture of Leonardo DiCaprio from the movie, The Wolf of Wall Street, thereby falsely suggesting that Avery Stone was the type of thief, scoundrel, and scam artist as Jordan Belfort, the real life character played by DiCaprio in that movie.

7. All of these statements and suggestions are false, have subjected the Plaintiff to humiliation, scorn and ridicule throughout the world, and have falsely portrayed Plaintiff to the world as a "crook" and "thief" who stole money from his friends pursuant to a sham business, then stole $400,000.00 of family possessions from his own father, and then "vanished" into thin air, with millions of "absconded" monies, like an international fugitive from justice and absconding thief.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Defendant, South China Morning Post Publishers Ltd., pursuant to Civil Practice Law and Rules ("CPLR" ) § 301 in that it is a foreign corporation that conducts business in the State of New York, and has sufficient contacts with readers, subscribers, and other persons in the State of New York, to the extent necessary to invoke New York jurisdiction.

9. South China Morning Post Publishers Ltd. has its principal place of business at Morning Port Centre, 22 Dai Fai Street, Tai Po Industrial Estate, Tai Po, New Territories, Hong Kong

10. Upon information and belief, in addition to its vast online presence, South China Morning Post has more than a hundred thousand print subscribers—many of whom are business and financial elites—who receive a printed version of South China Morning Post on a daily basis. It is regarded as the "paper of record" in Hong Kong.

3

11. This Court has jurisdiction over Defendant, Peter Guy, pursuant to CPLR § 301 in that he is an employee of south China Morning Post, and, upon information and belief, occasionally works in the State of New York.

12. Pursuant to CPLR § 503, venue is proper in this county because the Plaintiff currently resides in Westchester County.

## PARTIES

13. Plaintiff, Avery Stone, is a resident of Westchester County, State of New York.

14. Defendant, South China Morning Post, publishes one of the largest and most influential publications in Asia and elsewhere, and it is read each day by hundreds of thousands of people all over the world, including on the Internet.

15. Defendant, Peter Guy, is, and was at all relevant times herein, a reporter with South China Morning Post, and an employee and/or agent of South China Morning Post.

## FACTUAL ALLEGATIONS

### A. GMF's Business Activities

16. From 2008 until April 14, 2016, GMF engaged in the business of extending cash advances to local businesses in exchange for a percentage of future credit card receipts, as well as originating mortgage and SME loans. GMF operated in Hong Kong, Taiwan, and Singapore for most of that period of time. GMF investors made returns of approximately eight percent (8%) to fifteen percent (15%) per annum.

17. GMF was *not* a sham or fraudulent business.

18. GMF was *not* an illegal Ponzi scheme.

19. Eventually, however, despite the good faith and best efforts of GMF's directors, GMF faced liquidity challenges, credit losses, unprofitability, and finally—in April 2016—insolvency.

4

20. The Hong Kong Police Department were investigating Stone and his GMF co-directors, but after their initial investigation of disgruntled investors' allegations of wrongdoing, the Hong Kong Police concluded preliminarily that Stone and his co-directors had not engaged in any criminal misconduct.

21.     Upon information and belief, Defendants knew or should have known of this conclusion, or, at minimum, Defendants should have known of this conclusion.

### B.  The Defendants' September 22, 2016 Defamatory Acts and Statements

22. On September 22, 2016, Defendants published to hundreds of thousands of people throughout the world, an article about Avery Stone and his co-directors at Global Merchant Funding, Ltd. ("GMF"). (A copy of that article is annexed hereto and made a part hereof as Exhibit A).

23. The headline of the September 22, 2016 South China Morning Post article contained the following false and defamatory words, in large print and bold type, which clearly referred to Plaintiff, Avery Stone:

> *"Hong Kong's latest financial swindle shows how desperate we're getting in the era of ultra-low interest rates.  Investors in Global Merchant Funding have sought police help in recovering US $58 million, alleging that the three directors of the Hong Kong fund have absconded . . ."*

24. With the intent to bolster its sales and/or advertising sales, on September 22, 2016, Defendants published said article. This article was thus published to hundreds of thousands of people throughout the world, particularly those who follow closely the financial services industries.

25. The South China Morning Post article concerned, named and was about the Plaintiff, and the Defendants, with the deliberate and malicious intent to cause, or recklessly cause, the

5

Plaintiff to suffer severe emotional distress, and falsely, maliciously, and/or with reckless disregard for the truth, stated as fact that Plaintiff is a "*crook*" and a "*low-life*", who "**systematically preyed upon his friends**", "*duped*" GMF investors into investing $58 Million Dollars into GMF's sham, "ponzi scheme" of a business, stole $400,000.00 of family possessions from his own father, and then "*vanished*" as an absconding thief and international fugitive from justice.

26.  At all material times, Defendant, Peter Guy, was acting within the scope of his employment with South China Morning Post and South China Morning Post issued, approved, endorsed and/or ratified the defamatory statements in the September 22, 2016 South China Morning Post article as described herein.

27.     The Defendants knew or should have known of the falsity of such statements before they were published by South China Morning Post.

28.  On October 31, 2016, Bloomberg L.P., published to millions of people online in Bloomberg Markets and in print in Bloomberg Markets magazine a false and defamatory headline in large, bold letters, specifically regarding the Plaintiff, that falsely stated that the Plaintiff, described as a "**Smooth Talker**", "**Convinced Bankers to Invest $32 Million, Then Vanished**".

29. On November 1, 2016, Defendant South China Morning Post published an editorial which contained the following false and defamatory statements: (1) "{The Headline:} "***The trio of 'insiders' who relieved some of Hong Kong's top bankers of $32.5m, then disappeared. Accountants are still trying to work out exactly how the cash-advanced schemes devised by Stone, Grainger and Zoen managed to dupe so many 'friends.***"; (2) "***[E]arlier this year, everything unraveled, and he [Avery Stone] vanished.***"; (3) the Hong Kong Police were investigating Avery Stone and his partners for misappropriation; and (4) quoting Richard

6

Case 7:18-cv-08794   Document 1-1   Filed 09/25/18   Page 9 of 27

Stone, Avery Stone's father, that Avery Stone was a "***crook***" and a "***low-life***" who was "***lying low***" after stealing $400,000.00 of family possessions from his own father.

30. Defendants knew, or should have known, that each of these statements was false before they were published.

31. These false and scurrilous statements and suggestions constitute defamation and libel *per se* committed against the Plaintiff.

32. Indeed, these false statements and suggestions clearly impute fraud, dishonesty, criminal activity, and misconduct to Plaintiff with respect to his occupation, profession, and business.

33. The Defendants' statements that Plaintiff "***vanished***" after convincing bankers to invest $32.5 Million Dollars into his business, is patently false and was maliciously and recklessly intended to impugn Plaintiff's character.

34. By stating that Plaintiff had "***vanished***", the Defendants falsely stated or suggested that Plaintiff had absconded with ill-gotten monies and disappeared without a trace and without any means of further contact or communications.

35. Defendants thus falsely depicted Plaintiff as both an absconding thief and fugitive from justice.

36. In fact, in or about July, 2016, Plaintiff relocated to the town where he attended grade school, which is located right next to his childhood hometown in Westchester County, and advised several GMF investors as to where he was moving. (Indeed, numerous GMF investors knew that Plaintiff was moving to Westchester County, New York).

37. Moreover, Plaintiff, at all material times, was and remains contactable and accessible through a GMF Gmail account which continues to function to this date. Plaintiff and his co-directors directly communicated their new email address to all GMF investors in May, 2016.

7

38. Contrary to the Defendants' false and scurrilous statements, Plaintiff never "*vanished*". He simply moved and, at all material times, remained contactable and accessible to investors and any other individuals (including the Defendants) who desired to communicate with him. The Defendants, at all material times, knew or should have known that Plaintiff had not "*vanished*", but maliciously and recklessly repeated the false narrative that he had to falsely impugn Plaintiff's character and actions.

39. Upon information and belief, each of the Defendants knew that Plaintiff had moved to Westchester County, knew his precise whereabouts, and knew full well that Plaintiff had never "*vanished*."

40. Plaintiff is, and at all material times was, far from the deceitful absconding thief and international fugitive, on the lam and "*lying low*," as falsely and maliciously depicted by the Defendants.

***C. The November 1, 2016 Article's "Duping" and "Preying" Defamatory Statements***

41. The subject November 1, 2016 article published the following false statements:

*Over steak dinners and cigars, Stone charmed a Who's Who of financiers into investing millions in his fledgling business. Then, earlier this year, everything unraveled – and he vanished.*

*Left behind are the questions, including the big one: How did Stone and his partners at Global Merchant Funding Ltd. apparently dupe Hong Kong's princes of finance into believing their business was on solid-footing? Accountants are still trying to piece together the answers.*

*"This isn't a deal that went bad, these guys systematically preyed off their friends," said Thomas Gallagher, one of GMF's investors, who had set up Citigroup Inc.'s*

*fixed-income prime brokerage in Asia and now works for a hedge fund services firm.*

*"The fact of the matter is, these guys essentially were in our circle."*

42.  These statements, read both individually and in context with the November 1, 2016 article's headline and later "***crook***" and "***low-life***" allegations by Plaintiff's 82-year old father, falsely stated and suggested that: (1) Stone and his partners intentionally "***duped***" investors into investing in a business that they knew to be unsound and unprofitable; (2) Stone and his partners "***systematically preyed off their friends***," in other words, robbed them, rather than merely convinced them in good faith to invest in a high-risk business that unfortunately failed.

43. These false and scurrilous statements constituted defamation and libel *per se*, committed against the Plaintiff.

44. The South China Morning Post Defendant knew, or should have known, that these statements were false, before they were published.

45. These false statements, moreover, clearly impute fraud, dishonesty, criminal activity, and misconduct to Plaintiff with respect to his occupation, profession, and business.

46. The Defendant published the above-stated quote of Thomas Gallagher, despite knowing that his central assertion—***"This isn't a deal that went bad, these guys systematically preyed off their friends"***—was categorically and demonstrably false.

47. Indeed, the Defendant knew, or should have known, based on communications with JLA Asia, as well as other GMF investors, that there was (and is) no credible evidence that Plaintiff and his partners had launched a sham or fraudulent business that was designed merely to "***dupe***" investors out of their money and was not intended to make a profit for GMF's principals and investors.

9

48. In fact, many GMF investors who traded in and out of GMF equity and debt, made a substantial profit over the years that GMF operated the business.

49. At all material times, the South China Morning Post Defendant thus had substantial reasons to question the accuracy of Thomas Gallagher's statements about Plaintiff and GMF.

**D.    *The November 1, 2016 Article's "Crook" and "Low-Life" Defamatory Statement***

50.  The subject November 1, 2016 article published the following statement by and/or about Plaintiff's 82-year-old father, Richard Stone:

> *Stone's 82-year old father, Richard, said his son came home to the wealthy New York suburb of Pound Ridge earlier this year after he loaned him $89,000 "to get out of Hong Kong very fast." Yet Avery then stole $400,000 worth of family belongings, including his father's Smith & Wesson pistol, a Lalique bowl and collection of watches, he said. Police confirmed they were investigating the alleged theft.*
>
> *"He's a crook, ok? You can quote me on that," said Richard Stone. "He's lying low, because he's a low-life."*

51.  This false and scurrilous statement constituted defamation and libel *per se* committed against the Plaintiff.

52.  The South China Morning Post Defendant knew, or should have known, that this statement was false before it was published.

53.  This false statement, moreover, clearly imputes fraud, dishonesty, criminal activity, and misconduct to Plaintiff with respect to his occupation, profession, and business.

54.  This false statement, from Plaintiff's own father, further disparages and defames Plaintiff by buttressing the Defendants' earlier false statements to the effect that: (1) Plaintiff had "*vanished*", and (2) that Plaintiff had intentionally "*duped*" and "*preyed*" upon GML's

10

investors with a sham and fraudulent business as the vehicle for Plaintiff's alleged criminal fraud and misappropriation of investors' monies.

55. The statement of Plaintiff's father, as inserted in the Bloomberg article, was categorically and demonstrably false (except for Plaintiff's receipt of a loan in the sum of $89,000.00).

56. Indeed: (1) Plaintiff's father suffers from dementia (which is blatant and quickly obvious to those with whom he converses) that causes him to often be confused and utter preposterous, facially absurd, and clearly false statements; (2) Plaintiff's relatives—who are likewise the relatives of Richard Stone—would confirm both Plaintiff's father's dementia and the preposterously false allegations that Avery Stone stole anything—much less $400,000.00 of personal property—from him; (3) many of Richard Stone's friends, associates, and care providers, would likewise confirm both Plaintiff's father's dementia and the preposterously false allegations that Avery Stone stole anything—much less $400,000.00 of personal property—from him; and (4) the Pound Ridge, New York Police Department to whom Richard Stone leveled his baseless theft allegations against his son, would confirm that it does not have (and never had) any basis whatsoever to credit Richard Stone's dementia-induced fairytale of an account or to charge Avery Stone with any criminal wrongdoing.

57. Richard Stone, at all material times, has suffered, and continues to suffer, from dementia, which manifests in, *inter alia*, the following ways: (1) he has difficulty remembering recent conversations, names, and events; (2) he has extremely poor judgment; (3) he is frequently disoriented; (4) he is frequently and easily confused, particularly with respect to time and place; (5) he frequently has abrupt mood swings (i.e., quickly shifting from a pleasant disposition to extreme anger); (6) he has difficulty walking and maintaining an even, balanced gait; (7) he has substantially reduced concentration; (8) he has substantial difficulty in coping with challenges, planning, and solving day-to-day problems; (9) he has a loss of

11

affect facially (i.e., difficulty in smiling); (10) he frequently misplaces personal property and loses the ability to retrace his steps; and (11) he has withdrawn from some work activities and all social activities, including hobbies about which he had long been passionate (i.e., classic cars).

58. The South China Morning Post Defendants' use of the quote from Richard Stone to the effect that Plaintiff was "*lying low*", moreover, further buttressed the Defendants' false statements that Plaintiff had "*vanished*" and suggested that Plaintiff was an absconding thief and international fugitive from justice.

59. The Defendant knew that those statements and suggestions were patently false because they knew or should have known Plaintiff's precise whereabouts (i.e., his move to Westchester County) and that he remained contactable and accessible at all material times.

60. The Defendant knew or should have known that Plaintiff had not "*vanished*" and was not "*lying low*."

61. The South China Morning Post Defendant's use of the "*lying low*" quote, in conjunction with Richard Stone's other false assertion that Plaintiff was a "*crook*" demonstrates the depraved, malicious, and deliberate defamation of Plaintiff by said Defendant.

62. The South China Morning Post Defendant knew or should have known that Plaintiff had not "*vanished*" and was not "*lying low*" but they nevertheless included those false statements in their November 1, 2016 article to sensationalize their story and falsely paint Avery Stone as a malicious and evil villain and international fugitive from justice.

63. Upon information and belief, in November 2016, Richard Stone located in his home the Smith & Wesson gun that he had falsely accused Avery Stone of stealing.

64. Upon learning that his father had found his "stolen" gun, Avery Stone promptly reported that information to the Pound Ridge, New York Police Department.

65. The Pound Ridge Police Department then confiscated Richard Stone's gun and, upon information and belief, now have it in its custody and control.

66. At all material times, the South China Morning Post Defendant had substantial reasons to question the accuracy and truthfulness of Richard Stone's statements about Plaintiff, his son.

67. Had Defendant engaged in competent and professional reporting and exercised the care and diligence reasonably expected within the media industry, instead of acting with the malicious intent to smear, disparage, and defame Plaintiff, it would have quickly and easily ferreted out the falsity and patent absurdity of Richard Stone's allegations about his son.

## AS AND FOR A FIRST CAUSE OF ACTION

### Defamation and Libel *Per Se*

68. The Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 67, inclusive, as if fully set forth herein.

69. The above-stated defamatory and libelous statements described above have had a devastating and irreparable effect on the Plaintiff's personal and professional reputations. Additionally, multiple news organizations around the world have repeated the aforesaid false and defamatory statements by the Defendants about the Plaintiff, thereby causing further irreparable damage.

70. Each of the Defendants either published, or cause to be published, numerous false and defamatory statements about the Plaintiff.

71. The South China Morning Post published the above-referenced defamatory statements to the public through the online editions and printed editions of their September 22, 2016 and November 1, 2016 newspaper publications.

13

72. Each of these aforesaid defamatory statements were untrue and defamatory in that they falsely reported and mischaracterized the Plaintiff's character and actions, and each of the Defendants knew, or should have known, that such statements were false.

73. Each of the Defendants published these false and defamatory statements with malice.

74. Each of the Defendants published these false and defamatory statements with knowledge of their falsity and/or with a reckless disregard for the truth or falsity of these statements.

75. The above-referenced statements constitute defamation and/or libel *per se* because they falsely portray the Plaintiff as a man who is a "***crook***", who intentionally, maliciously, and deliberately "***duped***" investors out of $32 million pursuant to a sham and fraudulent business, stole $400,000.00 from his own father, and then "***vanished***" or "***disappear[ed]***" as a scam artist, ponzi scheme operator, absconding thief, and international fugitive from justice.

76. These aforesaid statements constitute defamation and/or libel *per se* because they falsely impugn the Plaintiff's honesty, trustworthiness, dependability, and professional fitness and abilities, and falsely charged him with engaging in criminal conduct, fraud, dishonesty and/or other conduct that would tend to injure the Plaintiff in his trade or business, and any trade, business, or profession which Plaintiff may seek to pursue.

77. These aforesaid false and defamatory statements have caused the Plaintiff (as well as his family members) severe embarrassment, humiliation and emotional injury.

78. Defendants are each liable to the Plaintiff, jointly and severally, for defamation.

79. The Defendants knew, or should have known, of the falsity of such statements made in the online and printed editions of the South China Morning Post on September 22, 2016 and November 1, 2016.

80. Upon information and belief, Defendants have made, and continue to make or cause to be made, these and similarly false and defamatory statements about the Plaintiff to third parties.

81. As a result of said defamation, the Plaintiff continues to suffer from severe humiliation, loss of standing in the community, loss of self-esteem, public disgrace, loss of standing and respect within his own family, and severe and extreme emotional distress.

82. The defamatory acts committed against the Plaintiff by Defendants were intentional, willful, wanton, malicious and oppressive and were motivated, in part, by a desire to sell news services and/or news (or website) advertising, without regard for the truth or the Plaintiff's well-being and were based on a lack of concern and ill-will toward the Plaintiff and/or a malicious, deliberate, and/or reckless disregard for his rights, for which the Plaintiff is entitled to an award of punitive damages.

83. At all material times, each of the Defendants acted in a grossly irresponsible manner without due consideration for the standards on information gathering and dissemination ordinarily followed by responsible parties.

84. At all material times, Defendants' aforesaid statements implied Defendants' knowledge of some false underlying facts, which stated or suggested that Plaintiff was a crook, low-life, thief, fraudster, scam-artist, Ponzi scheme operator, robber, swindler, conman, absconding thief, and fugitive from justice. These statements constitute defamation by implication, as well as defamation *per se*.

85. At all material times, Defendants defamed Plaintiff by—as stated above—making false statements which tended to expose Plaintiff to public contempt, ridicule, aversion or disgrace, and induced an evil opinion of him in the minds of right-thinking persons, and deprived him (and continues to deprive him) of their friendly intercourse in society.

86. The URL for the subject September 22, 2016 article, available online, is (http://www.scmp.com/business/article/2021700/hong-kongs-latest-financial-swindle-shows-how-desperate-were-getting-era).

Case 7:18-cv-08794   Document 1-1   Filed 09/25/18   Page 18 of 27

87. The URl for the subject November 1, 2016 article is:

(http://www.scmp.com/business/article/2041922/trio-insiders-who-prized-u325m-some-hong-kongs-top-bankers-then-disappeared).

88. These URLs (which are defamatory in and of themselves) falsely state and suggest that Plaintiff acted with malice and deliberate intent to capture or "***ensnare***" Hong Kong investors in a sham and fraudulent business with the sole, malevolent purpose of enriching Plaintiff and his co-directors.

89. Defendants acted with actual malice when they published the aforementioned news article and editorial about Plaintiff.

90. Defendant South China Morning Post knew or should have known that Thomas Gallagher and Richard Stone was each not a reliable source for truthful information about Avery Stone.

91. Defendants had serious doubts, or should have had serious doubts,  about the truth of the disparaging claims that they planned to make against Avery Stone, but intentionally violated commonly accepted journalistic norms and consciously either ignored or failed to investigate sources and information that they believed revealed, or would have revealed, the falsity of the charges that they leveled against Avery Stone.

92. Defendant were intent on painting the narrative that depicted Plaintiff as a crook, low-life, thief, fraudster, scam-artist, Ponzi scheme operator, robber, swindler, conman, absconding thief, and international fugitive from justice, and, having made the decision to so accuse Plaintiff, deliberately and maliciously ignored, obscured, buried, and failed to investigate, a plethora of information and sources that demonstrated the abject falsity of that narrative.

93. The Plaintiff has suffered harm as a result of the defamatory statements including, but not limited to, reputational harm, emotional distress and mental anguish, and the statements were defamatory and libelous *per se*.

16

94. Defendants' defamatory statements about Plaintiff, published and endorsed by Hong Kong's leading newspaper, has had, and will continue to have, a devastating and irreparable impact on Plaintiff's professional, business, and financial future.

95. As a result of Defendants' conduct, the Plaintiff is entitled to compensatory and punitive damages, as well as injunctive and declaratory relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Avery Stone, prays that the Court enter judgment in his favor and against each of the Defendants, jointly and severally, containing the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendants complained of herein were defamatory and intentionally or recklessly caused the Plaintiff to suffer severe emotional distress;

B.  An injunction and order permanently restraining Defendants from engaging in such unlawful conduct, and a writ of mandamus compelling Defendants, South China Morning Post and Peter Guy, to repudiate and retract their stories and false statements about Plaintiff, and publicly apologize to him;

C.  An award of damages in an amount to be determined at trial, but not less than $10 Million Dollars, plus prejudgment interest, to compensate the Plaintiff for all monetary and/or economic harm;

D.  An award of damages in an amount to be determined at trial, but not less than $20 Million Dollars, plus prejudgment interest, to compensate the Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

E.  An award of damages in an amount to be determined at trial, but not less than $20 Million

Dollars, plus prejudgment interest, to compensate the Plaintiff for all non-monetary and/or

compensatory harm, including, but not limited to, compensation for his mental anguish,

extreme emotional distress, and mental pain and suffering;

F.  An award of damages for any and all other monetary and/or non-monetary losses suffered by

the Plaintiff in an amount to be determined at trial, plus prejudgment interest;

G.  An award of punitive damages, in a sum not less than $20 Million Dollars;

H.  An award of costs that the Plaintiff has incurred in this action, as well as Plaintiff's

reasonable attorneys' fees to the fullest extent permitted by law; and

I.  Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: Orangeburg, New York                    Respectfully submitted,
       September 21, 2017


                                               **KEVIN T. MULHEARN, P.C.**


                                               *Kevin T. Mulhearn*

                                               By:_____
                                                     Kevin T. Mulhearn
                                                     Philip M. Culhane

                                               *Attorneys for Plaintiff, Avery Stone*

                                               60 Dutch Hill Road, Suite 15
                                               Orangeburg, New York 10962
                                               Phone: (845) 222-8092
                                               Fax:    (845) 398-3836
                                               Email: kmulhearn@ktmlaw.net

SCMP.COM

# South China Morning Post 南華早報

## Hong Kong's latest financial swindle shows how desperate we're getting in the era of ultra-low interest rates

PUBLISHED : Thursday, 22 September, 2016, 8:41pm
UPDATED : Friday, 23 September, 2016, 9:28am
Business › THE VIEW

**Peter Guy**

*Investors in Global Merchant Funding have sought police help in recovering US$58 million, alleging that the three directors of the Hong Kong fund have absconded...*

When is a lender no longer a lender?

Answer: when HK$450 million (US$58 million) of capital belonging to individual investors disappears without a trace.

Hong Kong police are investigating the collapse of a company engaged in the business of making cash advances to local businesses and a peer-to-peer mortgage lender. It is another case where investors were drawn together through unrealistic greed and similar backgrounds.

According to an investigative report by *Regulation Asia,* 65 out of 120 investors committed about US$48 million to GMF (Global Merchant Funding) via loan notes. The notes offered guaranteed annual returns of 8 per cent to 14 per cent. Investors came from Hong Kong, UK among other countries.

Another group of investors put up to US$10 million into P2P mortgage lender GMF Finance.

They, too, also contacted police with similar allegations of misappropriated funds. Some of the investors are prominent bankers.

Both companies operated as subsidiaries of Singapore-based GMF Group Holdings, whose directors are Richard Grainger, Avery Stone and Simon Zoen. Grainger and Stone were both living in Hong Kong at the time the companies failed.

Avery Stone used to be an executive at MasterCard Worldwide. He is also a former board member at the Hong Kong American Club. According to investors he met several investors through the club's social activities. Richard Grainger is a former director of debt capital markets at Barclays.

Shareholders and forensic accountants are currently investigating the two companies and they have been unable to contact Grainger and Stone since early this year. Directors of the company did not respond to e-mail queries by *Regulation Asia.*

GMF, which operated in Hong Kong, Taiwan and Singapore entered into voluntary insolvency in April this year. Their business offered cash advances to merchants in exchange for taking a commission based on their credit card receivables.

According to a member of the investor group, GMF stated it would restrict average cash advances to between US$20,000 and US$30,000, and never exceeding US$50,000. After 2010, GMF reported non-performing loans of less than 6 per cent.

However, the investors and accountants later discovered advances by GMF of about US$7 million each to two companies and US$5 million to another company. All three companies were later liquidated. The investors allege a GMF Group Holdings director was on the board of two of the three companies.

The investors say the company, which was founded in 2008 and claimed at one point to have 1,200 clients, was effectively insolvent for several years prior to actually entering liquidation. In 2014, according to another document, GMF made a net loss of US$15.91 million.

The document also said GMF would begin new loan note programmes on 29 February and 15 March, with guaranteed returns ranging from 9 per cent per annum on investments held for three months to 16 per cent for a 36-month-term note.

The SCMP reported in 2012 that GMF was accused of breaching the Money Lenders Ordinance by carrying on a business as an unlicensed money lender.

GMF was acquitted when it successfully argued that it only provided cash advances rather than loans. It was also awarded US$290,000 in damages.

An appeal was dismissed in April this year. Retail and banking sector analysts said the trial was a test case that could radically alter lending practises and regulation in Hong Kong.

It is not what you say that counts. It is what investors want to hear.

Since the financial crisis there has been a profound disconnect between clients and their financial advisers as investors are starving for investment yield. It has been so difficult to generate income from a portfolio that investors are desperate for any opportunity.

All investors ever paid attention to were the attractive, guaranteed yields. No one thought about the risks needed to achieve them. That leads to undisciplined and disastrous decisions.

GMF and its directors have not yet been charged. Whether or not the directors conspired to misappropriate funds or a series of bad lending decisions transpired into an irreversible business failure is not as important as what led to the investment decisions in the first place.

These kind of lending operations- whether or not they are Ponzi schemes, represent the shadowy, non-traditional banking world of Hong Kong consumer and small business finance companies.

As a risk class they tend to make excess returns when the general economy is doing well and then they fail miserably altogether when the economy turns down.

They claim they are diversified across numerous small businesses, but this kind of diversification is an illusion because all of them are heavily tied to the same, highly correlated economics.

**Peter Guy, a former international bankers, is also co-founder and editor-in-chief of *Regulation Asia***

**Topics:** The View

Yet Avery then stole $400,000 worth of family belongings, including his father's Smith & Wesson pistol, a Lalique bowl and collection of watches, he said. Police confirmed they were investigating the alleged theft.

"He's a crook, ok? You can quote me on that," said Richard Stone. "He's lying low, because he's a low-life."

What exactly were Stone and his partners up to? From its offices in Hong Kong's famed red-light district of Wan Chai – where GMF had outfitted an entire floor including a pool table and a stocked minibar, according to three people familiar with the space – the company's strategy relied on extending cash advances to local businesses in exchange for a cut of future credit card receipts.

> He's a crook, ok? You can quote me on that. He's lying low, because he's a low-life
>
> Richard Stone, Avery's father

Stone, Zoen and Grainger had established their company in 2008, citing more than "60 years of experience between them in the global banking and financial services industry," a cached view of GMF's website says.

Stone had previously worked at Mastercard Inc and American Express Co, Zoen cited experience in the card business at Citigroup. And Grainger had worked at Barclays.

Done right, the cash-advance business – new to Asia but well-established in the US and Europe – can generate double-digit returns with seemingly little risk, three GMF investors said.

The prospect of those returns reeled in investors. The company soon expanded to Singapore and Taiwan.

Stone exuded bonhomie, people who know him said. Grainger, a winger on the Hong Kong Police rugby team, expanded his network of investors via a three-year stint on a British Chamber of Commerce program for angel investors.

GMF, too, projected an air of easy success, even though it struggled to turn a profit. Stone was such a fixture at the American Club that many people thought he was on its board. He wasn't, according to the club.

John LeFevre, a former Citigroup banker known by his Twitter handle, @GSElevator, and author of the Wall Street memoir "Straight to Hell," said he invested in GMF early and got out with all his money in 2013.

SCMP.COM

# South China Morning Post 南華早報

## The trio of 'insiders' who relieved some of Hong Kong's top bankers of US$32.5m, then disappeared

PUBLISHED : Tuesday, 01 November, 2016, 2:00pm
UPDATED : Tuesday, 01 November, 2016, 10:58pm
Business
**Bloomberg**

*Accountants are still trying to work out exactly how the cash-advances scheme devised by Stone, Grainger and Zoen managed to dupe so many 'friends'*

Inside Hong Kong's upmarket American Club, few worked a room quite like Avery Stone.

Over steak dinners and cigars, Stone charmed a Who's Who of financiers into investing millions in his fledgling business. Then, earlier this year, everything unravelled, and he vanished.

Left behind are the questions, including the big one: How did Stone and his partners at Global Merchant Funding Ltd (GMF) apparently dupe Hong Kong's princes of finance into believing their business was on solid-footing? Accountants are still trying to piece together the answers.

"This isn't a deal that went bad, these guys systematically preyed off their friends," said Thomas Gallagher, one of GMF's investors, who had set up Citigroup Inc's fixed-income prime brokerage in Asia and now works for a hedge fund services firm.

"The fact of the matter is, these guys essentially were in our circle."

For many, the money in question – $32.5 million, a pittance by Wall Street standards – is far less astounding than whose money it is.

Documents related to the liquidation of Stone's company show that many of its investors were drawn from prominent international banks. For them, weighing financial risks is crucial to their day-to-day jobs. In this case, they didn't see the danger until it was too late.

Among those on a list of more than 80 creditors seen by Bloomberg News are: Morgan Stanley's co-chief executive officer for Asia excluding Japan, Gokul Laroia; Martin Wong, now chief integrity officer at a US software startup for online lenders and previously chief administrative officer and general counsel for the Asia-Pacific region at Citigroup; and Peter Tattersall, chief operating officer for fixed-income sales in Asia with Morgan Stanley, a role that involves responsibility for auditing and for implementing regulations.

> This isn't a deal that went bad, these guys systematically preyed off their friends...The fact of the matter is, these guys

essentially were
in our circle

Thomas Gallagher, a GMF
investor, who had set up Citigroup
Inc's fixed-income prime brokerage
in Asia



Others include Daniel Turner, a managing director for equities trading at Bank of America Merrill Lynch, where he has stock purchasing authority at the bank ranked No. 1 for equities trading market share in Asia last year, and Dermot Mayes, Nomura Holdings Inc's former head of fixed income and syndicate who is now chairman and CEO of Riviera Asia, which advises Asians investing in real estate in the south of France.

All of them directly or through a spokesman declined to comment.

Hong Kong police began investigating GMF after the company's liquidator, accounting firm JLA Asia, reported in April that it suspected the three directors – Stone, Richard Grainger and Simon Zoen – may have misappropriated some of the money owed to the investors. None of the three replied to telephone calls, registered letters or e-mails.

Stone's 82-year-old father, Richard, said his son came home, to the wealthy New York suburb of Pound Ridge, earlier this year after he loaned him $89,000 "to get out of Hong Kong very fast."



GMF's ability to lure high-profile investors created a virtuous circle for the young company, LeFevre said. People saw prominent financiers investing in GMF and wanted in.

"You get on the bus and it's all rich, smart guys, and we all think someone is driving, but everyone's just taking a nap in the back," said LeFevre, who cited frequent name-dropping of big investors as a means of bringing in new money.

But GMF, which employed about 30 people, was essentially insolvent for its final two years of operations, according to its liquidator, JLA Asia (JLA), now combing through 7,000 transactions in the case.

"We are still piecing together what happened," said Nisha George, a JLA manager.

According to a report JLA sent to investors, GMF posted a net loss every year from 2010 to 2014 – with the deficit ballooning to HK$123 million ($15.8 million).

A slew of lawsuits filed in 2012 and 2013 show GMF chasing up small merchants for cash-advance repayments ranging from HK$30,000 to more than HK$1 million. Zoen, the company's dealmaker, at some point suffered a heart attack and left Hong Kong, JLA said.

Representatives from one of Hong Kong's organised crime syndicates, known as triads, showed up at GMF's offices to deliver a warning about encroaching on their money-lending turf, according to LeFevre who said he was told about it by the directors at the time.

A GMF subsidiary failed to segregate money that should have been kept in a trust account on behalf of investors, according to JLA, and instead the money was used to pay rent, salaries and other expenses.

Even as GMF's troubles deepened, its founders sought to maximise their existing fund base and even expand it. It was, liquidators have since concluded, an attempt to play for time.

"They should have put up the white flag a lot earlier," said John Lees, executive chairman of JLA. "They have never really made money."

**Source URL:** http://www.scmp.com/business/article/2041922/trio-insiders-who-prized-u325m-some-hong-kongs-top-bankers-then-disappeared